UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SANTANDER CONSUMER USA, INC., | § | |
| | § | |
| | § | |
| Plaintiff/Counter-Defendant, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:16-CV-3310-B |
| | § | |
| ZEIGLER CHRYSLER DODGE JEEP-DOWNERS GROVE, LLC, | § | |
| | § | |
| | § | |
| Defendant/Counter-Plaintiff. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff/Counter-Defendant Santander Consumer USA Inc.'s (Chrysler Capital)[1] Rule 12(b)(6) Motion to Dismiss Defendant's Counterclaims. Doc. 14. For the reasons that follow, the Court **GRANTS in part** and **DENIES in part** Chrysler Capital's Motion.

## I.

## BACKGROUND

*A.    Factual Background*[2]

Defendant/Counter-Plaintiff Zeigler Chrysler Dodge Jeep-Downers Grove, LLC (Zeigler) operates an automobile dealership that sells new and used vehicles to consumers in the Chicago area. Doc. 4, Def.'s Answer, Affirmative Defenses, Countercl., and Jury Demand 10 [hereinafter Zeigler's Countercl.]. Chrysler Capital buys automobile retail installment sales contracts from automobile

---

[1] As Santander Consumer USA, Inc. does business as Chrysler Capital, for the purpose of clarity, the Court refers to Plaintiff as Chrysler Capital throughout the Order.

[2] The Court draws its factual account from the initial pleadings as well as the briefing on the Motion before the Court today. Any contested facts will be noted as such.

dealers such as Zeigler. Doc. 1-1, Pl.'s Orig. Pet. ¶ 6 [hereinafter Chrysler Capital's Orig. Pet.]. Zeigler points out that it can only offer certain incentives, such as 0% financing, if the funding source is Chrysler Capital. Doc. 4, Def.'s Countercl. 10. Therefore, to remain competitive, it needs access to funding through Chrysler Capital. *Id.*

In March 2013, Chrysler Capital and Zeigler entered into the Non-Recourse Master Dealer Agreement (the Non-Recourse Agreement). Doc. 15, Pl./Counter-Def. Santander Consumer USA Inc.'s Br. in Supp. of its Rule 12(b)(6) Mot. to Dismiss Def.'s Countercls. ¶ 1 [hereinafter Chrysler Capital's Br.]; Doc. 17, Def./Counter-Pl.'s Resp. in Opp'n to Pl./Counter-Def.'s Mot. to Dismiss 3 [hereinafter Zeigler's Resp.]; Doc. 4-2, Non-Recourse Master Dealer Agreement [hereinafter Non-Recourse Agreement]. The Non-Recourse Agreement governs Chrysler Capital and Zeigler's participation in a financing program (the Program) that provides customers the ability to obtain financing for the purchase or lease of automobiles from Zeigler. Doc. 4, Zeigler's Countercl. 14; Doc. 4-2, Non-Recourse Agreement 2.

When operating under the Non-Recourse Agreement, Zeigler would enter into retail installment sales contracts with customers and then sell and assign those contracts to Chrysler Capital. Doc. 17, Zeigler's Resp. 3–4; Doc. 4-2, Non-Recourse Agreement 2. Before selling the contracts, Zeigler had to submit the applications to Chrysler Capital. Doc. 4, Zeigler's Countercl. 11; Doc. 4-2, Non-Recourse Agreement 2. Chrysler Capital could approve, reject, or condition its approval of an application. Doc. 4-2, Non-Recourse Agreement 2.

In late 2015, Chrysler Capital allegedly represented that it had identified 27 sales by a single salesperson that it considered "suspicious." Doc. 4, Zeigler's Countercl. 19. Chrysler Capital claimed, according to Zeigler, that the identified salesperson had located potential customers with

unsatisfactory credit, assisted them with fraudulently cleansing their credit, and then helped them apply for financing with Chrysler Capital. *Id.* But Zeigler alleges that it was told that Chrysler Capital had no actual evidence of this activity. *Id.*

As a result of uncovering "suspicious" activity, Chrysler Capital stopped accepting applications for new financing transactions from Zeigler and blocked Zeigler's access to information related to current or pending applications without notice. *Id.* at 20. Chrysler Capital claims it had the authority to do so under Section 15(d) of the Non-Recourse Agreement. Doc. 15, Chrysler Capital's Br. ¶ 12. Section 15(d) states:

> Chrysler Capital may immediately suspend the Program without notice if it determines that there has been a pattern of fraudulent or suspicious activity, excessive Chargebacks, or excessive losses on Contracts. Upon such suspension, the Parties shall negotiate in good faith on further assurances to permit Chrysler Capital, in its sole discretion, to lift the suspension.

Doc. 4-2, Non-Recourse Agreement § 15(d).

According to Zeigler, Chrysler Capital then requested that Zeigler repurchase the disputed contracts. Doc. 4, Zeigler's Countercl. 22. Chrysler Capital claims it had the authority to make the request under Section 7(a) of the Non-Recourse Agreement, Doc. 1-1, Chrysler Capital's Orig. Pet. ¶¶ 11, 14. Section 7(a) states:

> Chrysler Capital shall have the right to require [Zeigler] to purchase from Chrysler Capital a Contract that [Zeigler] has originated . . . Further, Chrysler Capital may in its sole discretion require [Zeigler] to re-purchase all outstanding Contracts originated by [Zeigler] and assigned to Chrysler Capital if Chrysler Capital determines that there has been a pattern of fraudulent or suspicious activity.

Doc. 4-2, Non-Recourse Agreement § 7(a).

When Zeigler refused to repurchase the disputed contracts, Chrysler Capital allegedly called one or more of Zeigler's customers and told them that Zeigler was involved in fraudulent activity.

Doc. 4, Zeigler's Countercl. 21. These communications allegedly caused customers confusion and uncertainty regarding the status of their transactions with Zeigler. *Id.* Chrysler Capital also allegedly withheld funds owed to Zeigler based on the contracts at issue. *Id.*

Zeigler alleges that several months after Chrysler Capital froze the Program, it formally demanded that Zeigler repurchase 50 vehicle financing contracts that Zeigler had originated for Chrysler Capital under the Non-Recourse Agreement. *Id.* at 22. Zeigler refused and contends that Chrysler Capital uses its unique position in the marketplace to attempt to force Zeigler to assume the credit risk on certain contracts without providing a loan-by-loan analysis. *Id.* Furthermore, Zeigler asserts that Chrysler Capital refused to negotiate in good faith regarding lifting the suspension of the Program. *Id.* Zeigler maintains that Chrysler Capital intended to cause the financial harm from which Zeigler suffers. *Id.* at 23.

B.  *Procedural Background*

On October 7, 2016, Chrysler Capital filed this action in state court, asserting breach of contract. Doc. 1-1, Chrysler Capital's Orig. Pet. ¶ 15. Zeigler removed the state court action to this Court on November 28, 2016. Doc. 1, Notice of Removal. On December 9, 2016, Zeigler answered, asserted affirmative defenses, and brought counterclaims against Chrysler Capital. Doc. 4, Zeigler's Countercl. Zeigler asserted counterclaims for: (1) breach of contract; and (2) tortious interference with prospective contracts.[3] *Id.* at 24–25.

Chrysler Capital then filed a 12 (b)(6) Motion to Dismiss Zeigler's counterclaims for failure

---

[3] Zeigler makes a claim for "tortious interference with prospective business expectancy." Doc. 4, Zeigler's Countercl. 24. Courts applying Texas law use various terms such as "tortious interference with prospective contracts," "tortious interference with a prospective business relationship" and "tortious interference with reasonable expectancy" interchangeably. In this Order, the Court will refer to the cause-of-action as "tortious interference with prospective contract."

to plead facts sufficient to state a claim on which relief may be granted. Doc. 14, Pl./Counter-Def. Santander Consumer USA Inc.'s Rule 12(b)(6) Mot. to Dismiss Def.'s Countercls.; Doc. 15, Chrysler Capital's Br. Zeigler filed a Response (Doc. 17), and Chrysler Capital filed a Reply (Doc. 20). Thus, the Motion is ripe for the Court's review.

## II.

## LEGAL STANDARD[4]

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading that states a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) authorizes a court to dismiss a plaintiff's pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). The court will "not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

---

[4] This Section's references to "plaintiff" and "defendant" correspond to Zeigler (as counter-plaintiff) and Chrysler Capital (as counter-defendant), respectively.

liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* When well-pled facts fail to achieve this plausibility standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal quotation marks and alterations omitted).

## III.

## ANALYSIS

A.     *Breach of Contract*

"Texas recognizes the right of contracting parties to agree to choice of law." *Tel-Phonic Servs., Inc. v. TBS Intern., Inc.*, 975 F.2d 1134, 1142 (5th Cir. 1992). "Texas courts permit choice-of-law agreements and the default position is that they are enforceable." *Cardoni v. Prosperity Bank*, 805 F.3d 573, 581 (5th Cir. 2015). In the Non-Recourse Agreement, the parties state that it "shall be governed by and construed in accordance with the laws of the State of Texas." Doc. 4-2, Non-Recourse Agreement § 18(o). The parties do not challenge the enforceability of the contract's choice-of-law provision and assume only Texas law applies. Accordingly, the choice-of-law provision is enforceable and Texas law applies to all the claims relating to the contract in accordance with the parties' agreement.

Under Texas law, "[t]he essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (citing *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.)). In its

Motion, Chrysler Capital challenges only the third element—breach of the contract by the defendant. Therefore the Court will assume for purposes of this Motion that Zeigler properly pled the other three elements.

Zeigler alleges that Chrysler Capital breached the Non-Recourse Agreement in four ways: (1) Chrysler Capital breached a general provision stating that Chrysler Capital "will provide customers of [Zeigler] . . . the ability to obtain financing for the purchase or lease of Automobiles" by denying Zeigler's customers the ability to obtain financing after it froze the Program; (2) Chrysler Capital breached Section 15(d), allowing Chrysler Capital to suspend the Program "if it determines that there has been a pattern of fraudulent or suspicious activity," by suspending the Program without any basis and for the sole purpose of leveraging Zeigler into repurchasing disputed contracts; (3) Chrysler Capital breached Section 15(d), requiring upon suspension that "the Parties shall negotiate in good faith," by refusing to negotiate in good-faith about lifting the suspension; and (4) Chrysler Capital, by preventing Zeigler from accessing information about the Program, prevented Zeigler from performing Section 3(a) of the Non-Recourse Agreement, which requires it to obtain and process applications for Chrysler Capital. Doc. 4, Zeigler's Countercl. 24; Doc. 4-2, Non-Recourse Agreement 2; Doc. 4-2, Non-Recourse Agreement §§ 3(a), 15(d).

Chrysler Capital argues that Zeigler failed to state a claim for relief under its breach of contract theory because: (1) Section 15(d) of the Non-Recourse Agreement provides that Chrysler Capital may suspend the Program immediately and without notice, and retain the suspension indefinitely at its sole discretion; and (2) Zeigler's allegations of bad faith negotiating are conclusory and fail to state a claim. Doc. 15, Chrysler Capital's Br. ¶¶ 8–18. The Court will consider Zeigler's pleadings in light of Chrysler Capital's two arguments below.

1.    Section 15(d)

Chrysler Capital argues that Zeigler failed to state a claim for relief under its breach of contract theory because Section 15(d) of the Non-Recourse Agreement provides that Chrysler Capital may suspend the Program immediately and without notice, and retain the suspension indefinitely at its sole discretion. *Id.* ¶¶ 8–13. Chrysler Capital reasons that because it could suspend the Program at any time and for any duration, then it would be impossible to breach the contract in the ways described by Zeigler. More specifically: (1) Stopping one aspect of the Program—acceptance of financial applications—would not be a breach because Chrysler Capital had the authority to suspend the entire Program under Section 15(d); (2) suspending the program is not a breach because Section 15(d) allows Chrysler Capital to do so at its "sole discretion"; and (3) refusing to negotiate a lift of the suspension is not a breach because Section 15(d) allows Chrysler Capital to suspend the program indefinitely. *See id.* ¶¶ 8–13. Chrysler Capital does not appear to make a specific argument concerning Zeigler's allegation about Section 3(a).

Zeigler rejects Chrysler Capital's reliance on Section 15(d) because "Section 15(d) is a limited, defensive anti-fraud provision; it is *not* intended as a broad, punitive collection mechanism. . . . Section 15(d) does *not* authorize a suspension of the entire Program simply because Chrysler Capital believes that Zeigler should repurchase certain discrete—and disputed—contracts." Doc. 17, Zeigler's Resp. 10–11.

The arguments advanced by both parties regarding Section 15(d) concern the interpretation of the Non-Recourse Agreement and the intended function of Section 15(d). Chrysler Capital argues that its authority under Section 15(d) is such that none of Zeigler's allegations amount to a breach, while Zeigler argues that Section 15(d) is more limited and gives Chrysler Capital less power than

it believes. It appears, then, that the Court must consider the correct interpretation of Section 15(d) before turning to its effect on Zeigler's counterclaim.

i.     *Contract interpretation*

The Court's "primary concern in construing a written contract 'is to ascertain the true intent of the parties as expressed in the instrument.'" *Fed. Ins. Co. v. Northfield Ins. Co.*, 837 F.3d 548, 552 (5th Cir. 2016) (quoting *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)). To that end, the Court "evaluates the contract based on its plain meaning, determining what the words of the contract say the parties agreed to do." *Tetra Tech. Inc. v. Cont'l Ins. Co.*, 814 F.3d 733, 746 (5th Cir. 2016) (quoting *Likens v. Hartford Life & Accident Ins. Co.*, 688 F.3d 197, 199 (5th Cir. 2012)) (internal alterations omitted).

If a contract "is worded so that it can be given a definite or certain legal meaning, it is not ambiguous, and the court must construe [the policy] as a matter of law and enforce it as written." *Id.* at 746–47 (internal citations and quotations omitted). A contract "is ambiguous only when the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning." *Tesoro Ref. & Mktg. Co. v. Nat'l Union Fire Ins. Co. of Pitt.*, 833 F.3d 470, 474 (5th Cir. 2016) (quoting *RSUI Indem. Co. v. Lynd Co.*, 466 S.W.3d 113, 119 (Tex. 2015)) (internal quotations omitted).

In other words, a contract is ambiguous only if it is "susceptible to two or more reasonable interpretations." *Tesoro*, 833 F.3d at 474 (internal quotations and citations omitted). So neither the bare presence of conflicting interpretations nor mere "disagreement about the meaning of" its terms is enough. *Id.*

Here, the disputed clause is Section 15(d) of the Non-Recourse Agreement. Section 15

concerns "Termination; Event of Default." Section 15(d) provides:

> <u>Suspension</u> Chrysler Capital may immediately suspend the Program without notice if it determines that there has been a pattern of fraudulent or suspicious activity, excessive Chargebacks, or excessive losses on Contracts. Upon such suspension, the Parties shall negotiate in good faith on further assurances to permit Chrysler Capital, in its sole discretion, to lift the suspension.

Doc. 4-2, Non-Recourse Agreement § 15(d).

As discussed above, Chrysler Capital argues that the provision's language is unambiguous in stating that Chrysler Capital has the authority to suspend the Program at any time and for any duration, provided that it has determined that there is fraud. Doc. 15, Chrysler Capital's Br. ¶ 12. By contrast, Zeigler argues that the plain language of Section 15(d) establishes that its purpose is protective and defensive, and it is not meant to be used as an additional collection mechanism. Doc. 17, Zeigler's Resp. 2.

The Court agrees with Chrysler Capital. Here, the language of Section 15(d) unequivocally gives Chrysler Capital the ability to "immediately suspend the Program without notice if it determines that there has been a pattern of fraudulent or suspicious activity." Doc. 4-2, Non-Recourse Agreement § 15(d). The only reasonable interpretation of the first sentence of Section 15(d) is that Chrysler Capital may suspend the Program immediately if, by its sole determination, there has been a pattern of fraud or suspicious activity.

Zeigler's attempt to re-characterize the purpose of Section 15(d) as a limited, anti-fraud provision does not change the ordinary meaning of its wording. Zeigler does not argue that another reasonable interpretation of the language would require Chrysler Capital to give notice, or would require Chrysler Capital to give more than a subjective determination of finding fraudulent or suspicious activity. Instead, Zeigler's argument concerns the purpose of Section 15(d) and the way

in which it was intended to be applied. Doc. 17, Zeigler's Resp. 2.

Zeigler argues that Section 15(d) was not meant to be used as a punitive collection mechanism but rather a limited, defensive anti-fraud provision. *Id.* at 10–11. As the Non-Recourse Agreement contains no language limiting Chrysler Capital's utilization of Section 15(d) to the situations Zeigler describes, the Court cannot find that this is a reasonable alternative interpretation. Furthermore, interpretation of the intent of the parties beyond the language of the contract is irrelevant to contract interpretation when the contract's language is unambiguous, which Section 15(d) is. *Southeast Inv., Inc. v. Clade*, No. 3:97-cv-1799-L, 1999 WL 476865, at *3 (N.D. Tex. July 7, 1999) (explaining that "unless the contract's language is ambiguous the court will deem the contract provisions to express the intent of the parties and will enforce them as written").

In sum, Section 15(d)'s language is unambiguous. The Court will therefore apply it as written. With that in mind, the Court turns to Zeigler's breach of contract counterclaim.

  *ii.*  *Zeigler's breach of contract counterclaim*

Because Section 15(d) is applied as written, the Court finds that three of Zeigler's breach of contract theories necessarily fail.[5] First, Zeigler failed to state a claim for breach of the Non-Recourse Agreement under its theory that Chrysler Capital denied Zeigler's customers the ability to obtain financing. Because Chrysler Capital had the authority to suspend the entire Program under Section 15(d), it can necessarily suspend the portion of the Program involving "provid[ing] customers of [Zeigler] the ability to obtain financing for the purchase or lease of Automobiles." Doc. 4-2, Non-

---

[5] Because the Court construes the Non-Recourse Agreement as a matter of law, *Tetra Tech.*, 814 F.3d at 746–47, the three theories fail as a matter of law. Therefore, Zeigler will not be allowed to replead these theories. *Donnelly v. JP Morgan Chase, NA*, No. H-13-1376, 2014 WL 429246, at *6 (S.D. Tex. Feb. 4, 2014) (barring a plaintiff from repleading arguments that failed as a matter of law because it would have been futile).

Recource Agreement 2. Therefore, it was not a breach of the Non-Recourse Agreement to deny Zeigler customers' financing.

Second, Zeigler failed to state a claim for breach under its theory that Chrysler Capital unilaterally froze the Program without any basis and for the sole purpose of leveraging Zeigler into repurchasing the disputed contracts. Section 15(d) permits Chrysler Capital to "suspend the Program without notice if *it* determines that there has been a pattern of fraudulent or suspicious activity," so by the plain language Chrysler Capital can unilaterally freeze the program. Doc. 4-2, Non-Recourse Agreement § 15(d) (emphasis added). Further, the Non-Recourse Agreement does not limit the purposes for which Chrysler Capital may suspend the Program. Therefore, it was not a breach of the Non-Recourse Agreement to unilaterally freeze the Program.

Zeigler's theory under Section 3(a) also fails. The Non-Recourse Agreement provides that applications are "supplied by Chrysler Capital to [Zeigler] for use in connection with the Program." Doc. 4-2, Non-Recourse Agreement § 2. And under Section 3(a), Zeigler "shall assist Chrysler Capital, by providing information as required by Chrysler Capital." *Id.* § 3(a). First, Chrysler Capital has not alleged that Zeigler breached its duty under Section 3(a). *See* Doc. 1-1, Chrysler Capital's Orig. Pet. And second, because Chrysler Capital could suspend the entire Program, it was not a breach for it to suspend Zeigler's access to information about the Program.

It is not as clear, though, that Chrysler Capital's power under Section 15(d) forecloses, as a matter of law, Zeigler's theory that Chrysler Capital failed to negotiate in good faith. Section 15(d) provides that "[u]pon such suspension, the Parties shall negotiate in good faith on further assurances to permit Chrysler Capital, in its sole discretion, to lift the suspension." Doc. 4-2, Non-Recourse Agreement § 15(d). Zeigler alleges that Chrysler Capital has refused to negotiate in good faith. Doc.

4, Zeigler's Countercl. 23. The language is clear that Chrysler Capital must negotiate in good faith, regardless of its power under Section 15(d) to suspend the Program at its discretion. The fact that Chrysler Capital can suspend the Program indefinitely does not mean that it is excused from its duty to negotiate. Because Chrysler Capital's Section 15(d) argument does not bar this theory as a matter of law, the Court will now consider the sufficiency of Zeigler's factual allegations on this point.

2.      Zeigler's Allegation of Bad Faith Negotiating

Chrysler Capital argues that Zeigler's allegations of bad faith negotiating are conclusory because no facts were offered in support. Doc. 15, Chrysler Capital's Br. ¶ 14. Chrysler Capital attempts to demonstrate its negotiation efforts by pointing to: (1) the Joint Status Report which indicates that pre-litigation settlement discussions occurred; and (2) Zeigler's Counterclaims which identify that negotiations took place before and after the Program's suspension. *Id.* ¶ 15. Chrysler Capital's contention that negotiations took place does not foreclose the possibility that they were not conducted in good faith. Chrysler Capital also argues that Zeigler fails to state a claim because Section 7(a) allows Chrysler Capital to require Zeigler to repurchase all contracts and Section 15(d) allows Chrysler Capital to retain the suspension in its sole discretion. *Id.* ¶ 17. Chrysler Capital seems to reason that because it could have required Zeigler to buy back all the contracts, rather than just the "affected loans," it acted in good faith. Last, Chrysler Capital argues that because it could lift the suspension at its sole discretion, any further assurances established during negotiations would not necessarily compel it to lift the suspension. *Id.* ¶ 18. While this may be true, it does not excuse Chrysler Capital from negotiating in good faith in the first place.

While Chrysler Capital tries to demonstrate that it did negotiate by claiming that it did so over the disputed contracts or during the current litigation, Zeigler argues in its Response that the

requirement of Section 15(d) is not met by these instances. Doc. 17, Zeigler's Resp. 13 n.6, 15 n.8, 19–20. It is met only by negotiating with regard to the entire Program. *Id.* Zeigler concedes that Section 7(a) permits Chrysler Capital to seek repurchase to the extent that it can establish its right to relief. *Id.* at 13 n.5. Yet, Zeigler again contends that Section 15(d) does not allow Chrysler Capital to indefinitely suspend the Program without negotiating in good faith about lifting the suspension in order to pressure Zeigler to repurchase disputed contracts. *Id.* at 14–15.

Section 15(d) unambiguously imposes on Chrysler Capital the duty to negotiate in good faith. But, whether Chrysler Capital's examples of negotiation satisfy Section 15(d) is an issue of fact. And whether Chrysler Capital conducted negotiations in good faith is likewise a question of fact. Therefore, the Court need only find that it was adequately pled for it to survive Chrysler Capital's Motion.

A claim for breach "must identify the specific provision in the contract that was breached." *Williams v. Wells Fargo Bank, N.A.*, 560 F. App'x 233, 238 (5th Cir. 2014) (per curiam); *see also Baker v. Great N. Energy, Inc.*, 64 F. Supp. 3d 965, 971 (N.D. Tex. 2014) (finding that the plaintiff failed to state a breach of contract claim because it did not point to a specific provision in the contract that was allegedly breached); *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 995 F. Supp. 2d 587, 602 (N.D. Tex. 2014) (finding that the plaintiff failed to state a breach of contract claim where the complaint did not identify what provisions were breached or provide factual allegations about the terms at issue).

Allegations of a breach of contract will survive a 12(b)(6) motion to dismiss for failure to state a claim if they are "clearly based on contractual provisions." *LVI Facility Servs., Inc. v. Watson Rd. Holding Corp.*, A-12-cv-672-LY, 2013 WL 5519588, at *4–5 (W.D. Tex. Oct. 1, 2013), *adopted*

by *LVI Facility Servs., Inc. v. Watson Rd. Holding Corp*, 1:12-cv-672-LY, 2013 WL 12131201 (W.D. Tex. Dec. 4, 2013) (finding that the plaintiff stated a breach of contract claim by identifying specific contractual provisions and alleging that the defendant breached them by specific conduct).

Zeigler's theory regarding how Chrysler Capital breached the Non-Recourse Agreement by refusing to negotiate in good faith identifies a specific provision in the Non-Recourse Agreement and Zeigler advances facts for the allegation. At this stage, the Court is satisfied that Zeigler has pled "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Accordingly, the Court **DENIES** Chrysler Capital's Motion to Dismiss Zeigler's breach of contract counterclaim.

B.    *Tortious Interference with Prospective Contract*

Zeigler alleges a tortious interference with prospective contract counterclaim against Chrysler Capital. Doc. 4, Zeigler's Countercl. 24–25. Zeigler contends that: (1) there existed a reasonable probability that Zeigler would have entered into a contractual relationship with potential customers had Chrysler Capital not contacted them to tell them that fraud had occurred in connection with Zeigler's business; (2) Chrysler Capital's conduct was an independently tortious and wrongful act; (3) Chrysler Capital engaged in the conduct with malice and a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result; and (4) Zeigler was damaged as a result of Chrysler Capital's conduct. *Id*. at 25.

Chrysler Capital argues that Zeigler failed to state a claim for relief under its tortious interference with prospective contract theory because: (1) Zeigler failed to plead facts establishing a reasonable probability of future contracts but rather speculated about possible future contracts; (2) Chrysler Capital's conduct was not independently tortious or unlawful because it was communicating

with its own customers; (3) Zeigler's pleadings fail to show that Chrysler Capital intended to prevent Zeigler from entering into prospective contracts; and (4) Zeigler could not have been harmed by the communications because Chrysler Capital had suspended the Program and was not buying any new contracts from Zeigler, Chrysler Capital could suspend and reinstate the Program at its sole discretion, and Chrysler Capital could reject any application for a contract at its sole discretion. Doc. 15, Chrysler Capital's Br. ¶¶ 19–26.

The elements of tortious interference with prospective contract are:

(1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result.

*Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*, 786 F.3d 400, 417 (5th Cir. 2015) (quoting *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013)). The Court will address the disputed elements below.

1.    Reasonable Probability of Future Business Relationship

To establish tortious interference with prospective contract, one must first show more than speculation or the bare possibility that a plaintiff would have entered into a future business relationship. *See Flying Crown Land Grp. v. Reed*, No. 3:15-cv-1225, 2015 WL 4750786, at *2 (N.D. Tex. Aug. 11, 2015). "It need not be absolutely certain that the prospective contract would have been made were it not for such interference. A reasonable assurance thereof in view of all the circumstances is generally sufficient." *Verkin v. Melroy*, 699 F.2d 729, 732 (5th Cir. 1983) (quoting *Martin v. Phillips Petroleum Co.*, 455 S.W.2d 429, 435 (Tex. Civ. App.—Houston [14th Dist.] 1970,

no writ)). While "mere negotiations" are not enough, a pre-existing business relationship can suffice to show a reasonable probability of prospective contractual relations. *N. Cypress Med. Ctr. Operating Co., Ltd. v. Gallagher Benefit Servs., Inc.*, No. 11-cv-0685, 2012 WL 2870639, at *7 (S.D. Tex. July 11, 2012) (quoting *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475 (Tex. App.—Houston [1st Dist.] 2006, pet. denied)).

Here, Zeigler fails to allege with a reasonable probability that it would have entered into a business relationship with potential customers. As Chrysler Capital notes, "There are also no facts [pled] that [Chrysler Capital] communicated with prospective customers about *prospective* car sales/contracts, and that those prospective customers then refused to enter into a new contract with [Zeigler] because of communication with [Chrysler Capital]." Doc. 15, Chrysler Capital's Br. ¶ 21. Even though identifying prospective, new customers is not necessarily required because a pre-existing business relationship can suffice to show a reasonable probability of prospective contractual relations, Zeigler did not make this allegation in its Complaint. Instead, Zeigler asserted that "[t]here existed a reasonable probability that Zeigler had one or more *potential customers*" who would have entered into a contractual relationship.[6] Doc. 4, Zeigler's Countercl. 25 (emphasis added). Zeigler also alleges that Chrysler Capital's communications with the customers interfered with its ability to maintain ongoing relationships[7] with its customers. Doc. 4, Zeigler's Countercl. 21–22. In sum, from the facts

_____

[6] In its Response, though, Zeigler asserts that providing high quality service and customer experiences would result in repeat business. Doc. 17, Zeigler's Resp. 21. But from the facts pled in the Counterclaim about obtaining potential customers, the Court cannot infer that already-existing customers would repeat business. Even if Zeigler had alleged in the Counterclaim that there was a reasonable probability of repeat customers, Zeigler failed to allege that this repeat business would have occurred with the customers with which Chrysler Capital had communicated.

[7] With Zeigler's allegation that Chrysler Capital interfered with Zeigler's maintenance of ongoing relationships, it is unclear if Zeigler also intended to bring a tortious interference with an existing contract claim. The elements of tortious interference with existing contract are: "(1) an existing contract subject to

- 17 -

pled by Zeigler in its Counterclaim, the Court cannot infer that there was a reasonable probability of future business relationships. *Iqbal*, 556 U.S. 678. Thus, Zeigler has failed to adequately plead the first element. The Court will nonetheless consider several other elements.

2. Independently Tortious or Unlawful Behavior

A plaintiff seeking recovery for tortious interference with prospective contract must "'prove that the defendant's conduct was independently tortious or wrongful' as an element of the cause of action." *In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 705 (Tex. 2015) (quoting *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001)). Consequently, a plaintiff is required to plead independently tortious behavior to survive a motion to dismiss under Rule 12(b)(6). *XP Innovations Inc. v. Black Rapid, Inc.*, No. H-13-1856, 2013 WL 6230368, at *4 (S.D. Tex. Dec. 2, 2013). "Independently tortious does not mean that the plaintiff must be able to prove an independent tort"; rather, a plaintiff must "prove that the defendant's conduct would be actionable under a recognized tort." *N. Cypress Med. Ctr.*, 2012 WL 2870639, at *7 (quoting *Sturges*, 52 S.W.3d at 726) (internal quotation marks omitted); *see also Barrash v. Am. Ass'n of Neurological Surgeons, Inc.*, 4:13-cv-1054, 2013 WL 4401429, at *4 (S.D. Tex. Aug. 13, 2013) (concluding that the plaintiff had not adequately pled independently tortious behavior because the plaintiff failed to adequately plead several elements of the alleged tort).

In Zeigler's Counterclaim, it alleges that "contacting customers to tell them that fraud had occurred in connection with Zeigler's business constitutes an independently tortious and/or wrongful

---

interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). As discussed below, the Court is allowing Zeigler the opportunity to replead and amend its Counterclaim. Therefore, if Zeigler intended to bring this claim instead of its tortious interference with a prospective contract claim, it is free to amend its Counterclaim to reflect that.

act." Doc. 4, Zeigler's Countercl. 25. Zeigler, however, neither references a specific tort nor lists any elements of a relevant tort. Chrysler Capital again focuses on the difference between prospective customers and existing customers, and also asserts that it had the right to talk to Zeigler's customers, so it could not have committed a tort. Doc. 15, Chrysler Capital's Br. ¶ 23. In its Response, however, Zeigler finally clarifies that the independent tort in question is slander.[8] Doc. 17, Zeigler's Resp. 21. Chrysler Capital does not address Zeigler's allegation of slander in its Reply. *See* Doc. 20, Chrysler Capital's Reply. While Zeigler does not expressly refer to slander in its Counterclaim, the Court will construe the Counterclaim as doing so for purposes of this Motion. Ultimately, Zeigler failed to plead each of the elements required to allege slander.

"[S]lander is defamation without legal excuse, published orally." *Melgarejo v. 24 Hour Prof'l Janitorial Servs.*, No. 3:07-cv-1847-B, 2008 WL 3342705, at *2 (N.D. Tex. Aug. 7, 2008) (citing 50 Tex. Jur. 3d *Libel and Slander* § 4). Under Texas law, a defamation claim requires the plaintiff to prove that the defendant: "(1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with negligence, if the plaintiff was a private individual, regarding the truth of the statement." *Lacy v. Dallas Cowboys Football Club*, 3:11-cv-0300-B, 2012 WL 2795979, at *12 (N.D. Tex. July 10, 2012) (quoting *WFAA-TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex. 1998)).

---

[8] The Court is not convinced that slander, and in turn, defamation, are the proper claims based on the facts. Where "defamation actions chiefly serve to protect the personal reputation of an injured party . . . a business disparagement claim protects economic interests." *In re Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015) (quoting *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003)). Business disparagement does not seek to redress dignitary harms to the business owner, as defamation does, "but rather redresses aspersions cast on the business's commercial product or activity that diminishes those interests." *Id.* (quoting *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766–67 (Tex. 1987)). As defamation seeks to redress the dignitary harms to the business owner and Zeigler has failed to allege that its business owner has been harmed by Chrysler Capital's slander, it does not appear that slander is the appropriate tort.

A statement is published if it is communicated to a "third person who is capable of understanding its defamatory meaning and in such a way that the person did understand its defamatory meaning." *Thomas-Smith v. Mackin*, 238 S.W.3d 503, 507 (Tex. App.—Houston [14th Dist.] 2007, no. pet.). Further, defamation claims "must specifically state the time and place of the publication," *Jackson v. Dallas Ind. Sch. Dist.*, No. 3:98-cv-1079, 1998 WL 386158, at *5 (N.D. Tex. July 2, 1998), as well as the alleged defamatory statement and the speaker, *Ameen v. Merck & Co.*, 226 F. App'x 363, 370 (5th Cir. 2007) (citations omitted). "A statement is defamatory if it exposes a person to . . . 'financial injury or if it impeaches any person's honesty, integrity, virtue, or reputation.'" *Double Diamond, Inc. v. Van Tyne*, 109 S.W.3d 848, 854 (Tex. App.—Dallas 2003, no pet.) (quoting Tex. Civ. Prac. & Rem. Code § 73.001) (internal alterations omitted). "Texas courts have defined negligence in the defamation context as the 'failure to investigate the truth or falsity of a statement before publication, and [the] failure to act as a reasonably prudent [person].'" *Fawcett v. Rogers*, 492 S.W.3d 18, 27 (Tex. App.—Houston (1st Dist.) 2016, no pet.) (quoting *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 85 (Tex. App.—Houston [1st Dist.] 2013, pet. denied)).

Zeigler ultimately fails to plead slander as an actionable tort because Zeigler failed to plead element three—that an employee at Chrysler Capital acted with negligence regarding the truth of the statement. There is no indication in the facts alleged that an employee knew or should have known that any statement about Zeigler's allegedly fraudulent activity was false. Zeigler reasons that it has pled this element by demonstrating that Chrysler Capital failed to provide Zeigler with evidence or documentation supporting its statements. Doc. 4, Zeigler's Countercl. 19. Therefore, if Chrysler Capital lacked evidence, then it knew or should have known that its statements were false.

But, the Court cannot infer that Chrysler Capital's failure to identify evidence means that its employees knew or should have known that such statements were false. Because Zeigler failed to adequately allege that Chrysler Capital committed slander, Zeigler failed to plead that Chrysler Capital engaged in independently tortious behavior.

### 3. Actual damages resulting from Chrysler Capital's interference

To state a claim for tortious interference with prospective contract, a plaintiff must show an actual loss suffered, and that the defendant's tortious interference proximately caused that loss. *Official Brands, Inc. v. Roc Nation Sports, LLC*, No. 3:15-cv-2199, 2015 WL 8915804, at *6 (N.D. Tex. Dec. 15, 2015). Such a loss must be ascertainable at the time of the litigation. *See Impala African Safaris, LLC v. Dall. Safari Club, Inc.*, No. 13-cv-2175-G, 2014 WL 4555659, at *8 (N.D. Tex. Sept. 9, 2014).

Zeigler has alleged that Chrysler Capital's communications "caused customer confusion and uncertainty," "interfered with Zeigler's ability to successfully maintain ongoing and financially beneficial relationships," and "caused reputational harm to Zeigler." Doc. 4, Zeigler's Countercl. 21–22. Zeigler relies on *Harold H. Huggins Realty, Inc. v. FNC, Inc.* to argue that the complaint there is similar to Zeigler's and that the Court should similarly find that Zeigler stated a plausible claim to relief. Doc. 17, Zeigler's Resp. 23. The Fifth Circuit in *FNC* held that the plaintiff's first amended complaint, which "explicitly pleads that FNC has caused the plaintiffs to lose business and profits," stated "a plausible, non-speculative claim for damages." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 803 n.44 (5th Cir. 2011).

Here, unlike the plaintiff in *FNC*, Zeigler has failed to allege any actual damages ascertainable at the time of the litigation with regard to prospective contractual relations. Zeigler does not allege

lost business or profits. Even when Zeigler's allegations are taken as true, speculation is required to conclude that customer confusion led to damages, that Chrysler Capital's interference caused damages, or that Zeigler's reputational harm resulted in damages. For the same reasons, Zeigler's allegations also fail to demonstrate that Chrysler Capital's actions proximately caused it loss.

Zeigler fails to allege a tortious interference with prospective contract claim. Specifically, Zeigler failed to allege beyond speculation that there was a reasonable probability of a future business relationship, Chrysler Capital committed an independently tortious or unlawful act, and Zeigler suffered actual damage. Without more, the Court cannot infer that Zeigler can recover under a tortious interference with prospective contract claim. See *Iqbal*, 556 U.S. at 678. Therefore, the Court **GRANTS** Chrysler Capital's Motion with regard to this claim and **DISMISSES without prejudice** Zeigler's tortious interference with prospective contract counterclaim.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Chrysler Capital's Motion to Dismiss (Doc. 14) with regard to Zeigler's counterclaim for breach of contract[9] and **GRANTS** Chrysler Capital's Motion to Dismiss (Doc. 14) with regard to Zeigler's counterclaim for tortious interference with prospective contract. Accordingly, the Court **DISMISSES without prejudice** Zeigler's counterclaim for tortious interference with prospective contract. The Court finds it appropriate, however, to give

---

[9] As discussed above, however, the Court rejects, as a matter of law, each of Zeigler's theories except for its theory that Chrysler Capital breached the Non-Recourse Agreement by failing to negotiate in good faith. Therefore, this theory is the only reason the breach of contract counterclaim survived Chrysler Capital's Motion to Dismiss.

Zeigler an opportunity to replead it counterclaims.[10] An amended complaint is due on or before

**Monday, July 24, 2017**.

      **SO ORDERED.**

      **SIGNED: June 26, 2017.**

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

---

[10] Normally, courts will afford a plaintiff the opportunity to overcome pleading deficiencies, unless it appears that the defects are incurable. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.") Here, Zeigler failed to plead a claim with sufficient factual specificity. Given that this is the Court's first review of his pleadings, it is proper to grant Zeigler leave to amend his Complaint, if it can do so in a way that overcomes the deficiencies identified in this Order.